## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

      **Plaintiff,**

v.                                                      Case No. 13-40065-DDC

RAYMOND ALCORTA (03),
ADRIENNE LOPEZ (06), and
ANGELA MARIE LOPEZ (07),

      **Defendants.**

## MEMORANDUM AND ORDER

On October 23, 2014, a jury convicted defendants Raymond Alcorta, Adrienne Lopez, and Angela Marie Lopez of conspiring to distribute more than 500 grams of methamphetamine. The jury also convicted Adrienne Lopez and Angela Marie Lopez of knowingly and intentionally possessing more than 500 grams of methamphetamine with intent to distribute it. At the close of the government's evidence during trial, each defendant made a motion for acquittal under Federal Rule of Criminal Procedure 29. The Court reserved judgment on defendants' motions until after the jury returned a verdict and decides them now. For the following reasons, the Court denies each defendant's motion.

### I.  Legal Standard

Fed. R. Crim. P. 29(a) provides:  "After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  The rule also authorizes a court to reserve decision on the motion and decide it after the jury returns a verdict.

Fed. R. Crim. P. 29(b).  However, when the Court reserves judgment, "it must decide the motion on the basis of the evidence at the time the ruling was reserved."  *Id.*

In reviewing a motion for judgment of acquittal, the Court views the evidence in the light most favorable to the government.  *United States v. Hughes*, 191 F.3d 1317, 1321 (10th Cir. 1999).  The Court must uphold the jury's guilty verdict if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United States v. Haber*, 251 F.3d 881, 887 (10th Cir. 2001) (emphasis in original).  The Court considers direct and circumstantial evidence, plus reasonable inferences drawn from that evidence.  *United States v. Davis*, 1 F.3d 1014, 1017 (10th Cir. 1993).

## II. Raymond Alcorta

The jury convicted defendant Alcorta of conspiring to distribute more than 500 grams of methamphetamine.  To prove a conspiracy, the government was required to show:  (1) an agreement to violate the law; (2) Mr. Alcorta's knowledge of the conspiracy's objective; (3) Mr. Alcorta's knowing and voluntary participation in it; and (4) interdependence among the conspirators.  *United States v. Keck*, 643 F.3d 789, 794 (10th Cir. 2011).  Mr. Alcorta contends that the evidence at trial did not establish that he joined the conspiracy or acted in furtherance of the conspiratorial objectives.  Rather, Mr. Alcorta argues the most a jury could infer from the evidence is that he knew about the conspiracy and was associated with his co-defendants.  The Court disagrees.

The evidence tied Mr. Alcorta to both loads of methamphetamine seized by Kansas' interdiction efforts.  For instance, Exhibit 1-16, an unclaimed wireless phone recovered from the Jeep driven by Javier Vega on the day he was arrested transporting nearly four pounds of the controlled substance, showed text traffic between the phone and the number 562.458.3479.  That

number corresponds to a wireless telephone used by Mr. Alcorta. A rational jury could have viewed the content of a series of texts as ones soliciting Mr. Vega to serve as a courier to transport drugs for Mr. Alcorta, *i.e.*, "I need to know if you're going." Four days after Mr. Alcorta sent this text to Mr. Vega, the Kansas authorities apprehended Mr. Vega nearly a thousand miles from home with a significant quantity of methamphetamine *and* the unclaimed telephone in his vehicle.

In June 2013, about two months after Mr. Vega's methamphetamine arrest, Kansas law enforcement officials arrested Angela Lopez and Adrienne Lopez. They, too, were transporting a cache of methamphetamine across Kansas and they, too, had incriminating ties to Mr. Alcorta. Mr. Alcorta and Mr. Vega discussed the Lopez' arrests on a recorded jail line, and Mr. Vega informed Mr. Alcorta about precautions he had taken before his April arrest in Kansas. He told Mr. Alcorta, "[B]efore I left when, when, when everything was all ready, when everything was all ready I mean I had uh uh factory reset my phone." And then Mr. Vega asked Mr. Alcorta whether he "kn[ew] what [he was] saying?" Mr. Alcorta assured him he indeed understood the import of Mr. Vega's statement. A rational jury could interpret this exchange as one conspirator assuring his confederate that he successfully had hid evidence of their joint wrongdoing.

After authorities released Adrienne Lopez on bond, she and Mr. Vega discussed his use of his sister's Jeep on the fateful drug trip to Kansas. Mr. Vega said that his drug arrest resulted in the authorities taking his sister's car from him. Adrienne reminded him that his sister had lent him the Jeep, but Mr. Vega challenged her assertion. He asked, rhetorically, "[Did] she lend [the Jeep] to me or [did] she lend it to Ray [Alcorta]?" A rational jury could interpret this exchange as one conspirator reminding another that Mr. Alcorta had orchestrated Mr. Vega's use of the Jeep on his drug trafficking trip to Kansas.

These conversations merely illustrate the many evidentiary connections between the conspiracy charged by the Indictment and Mr. Alcorta. There are many more. *E.g.*, Ex. 6-38 (where Mr. Vega counsels Adrienne Lopez about how carefully she must execute her upcoming drug trip by telling her about a careless woman that "Ray" had told Mr. Vega to take with him on an earlier drug trip); Ex. 6-34 (Mr. Vega lamenting to Adrienne Lopez from a Kansas jail, "[W]hy didn't Ray ever tell me to to take, to bring you to Kansas?" and surmising that "this" never would have happened to Mr. Vega had he done so). In sum, the evidence provided adequate support for a reasonable jury to conclude that Mr. Alcorta and other conspirators agreed to violate the law, that he knew the conspiracy's objectives, that he knowingly participated in the conspiracy, and that interdependence existed among the conspirators. Viewing the evidence in the light most favorable to the government, including the circumstantial evidence, the Court overrules Mr. Alcorta's motion under Rule 29.

### III. Adrienne Lopez and Angela Marie Lopez

The jury convicted defendant Adrienne Lopez and defendant Angela Marie Lopez of (1) conspiracy to distribute more than 500 grams of methamphetamine and (2) possession with intent to distribute more than 500 grams of methamphetamine. The government presented ample evidence to support those convictions.

On June 21, 2013, Trooper Krause of the Kansas Highway Patrol pulled a car over while Angela Marie Lopez drove it. Adrienne Lopez was riding in the car in the front passenger seat. Trooper Krause eventually searched the vehicle and found four pounds of 100% pure methamphetamine in the bottom of a small cooler situated directly behind the two Ms. Lopezes in the back seat. After this discovery, Trooper Krause arrested both Adrienne and Angela.

4

A jury could reasonably conclude that the Lopez defendants knowingly possessed methamphetamine with intent to distribute it.  The government introduced evidence of a June 20, 2013, recorded phone call between Adrienne Lopez and Javier Vega during which Mr. Vega told Adrienne to "be careful" and to "remember what I told you about, about the signs."  In previous calls, Mr. Vega had repeatedly warned Adrienne to stay on the highway and not exit if she saw any "signs."  A jury could reasonably infer that Mr. Vega was talking about a ruse drug checkpoint.[1]  A rational jury could conclude that Mr. Vega's warning to Adrienne about the "signs" and her apparent understanding of what he meant shows that Adrienne knew she was transporting drugs.

A rational jury could also conclude that recorded phone calls showed Angela Marie Lopez knew she was transporting methamphetamine intended for distribution to others.  After her arrest, Angela called her mother from jail and said, "I never did this the first time I got busted . . . but yeah mom the last two days I told God, that's it, *I'm not gonna run no more* . . ."  Angela Lopez also said that if the police released her co-defendant, Adrienne Lopez, they would have to release Angela as well because Adrienne Lopez had "more bad things"—a reference to the fact that Adrienne had marijuana in her purse when she was arrested.  The fact that Adrienne had *more* "bad things," indicates that Angela knew she had at least some "bad things" in her possession; otherwise she would not have used the word "more."  Finally, Angela expressed surprise at the *amount* of methamphetamine found in the car, but she never expressed surprise that there *was* methamphetamine in the car.

---

[1] In a ruse drug checkpoint, drug interdiction officers set up signs along a highway warning of a drug checkpoint ahead.  The officers place the signs just before an infrequently used exit, thereby giving drivers an opportunity to avoid the checkpoint—which does not actually exist—by leaving the highway. Interdiction officers monitor the exit and watch for suspicious activity when drivers use it to exit the highway.  In Mr. Vega's case, police discovered he was driving four pounds of methamphetamine in part because he exited the highway after seeing signs for a ruse drug checkpoint.

The government also presented evidence that Adrienne Lopez and Angela Marie Lopez made a drug courier run around 10 days before the June 21 stop. The government played a phone call between Mr. Vega and Adrienne from June 11, 2013. Adrienne told Mr. Vega that she was about an hour from Kansas City, and Mr. Vega warned her to keep going no matter what she saw on the highway—another apparent reference to a ruse drug checkpoint. Adrienne said she understood. Two days later, Mr. Vega asked Adrienne if "everything was cool." Adrienne replied that it was and that she had been in Kansas City since Monday. She also told Vega that "Ray" was already "home." Later in the call, Mr. Vega said he went to jail owing "Ray" "six racks." On June 14, Mr. Vega asked Adrienne how long it took her "to get home," and Adrienne said, "we flew." Photos on cell phones seized from the women after their June 21 arrest corroborate that Angela and Adrienne flew home after a trip to Kansas City on June 11. The photos, taken on June 14, showed the two Lopez defendants together on an airplane, flashing large amounts of cash.

From this evidence a jury could conclude that Adrienne and Angela made another drug courier trip around June 11, received payment for the drugs, and then flew back to California. They could also conclude that Ray Alcorta was involved in the transaction, based on conversations between Mr. Vega and Adrienne Lopez.

In summary, the government presented evidence from which a rational jury could find beyond a reasonable doubt that Adrienne Lopez and Angela Lopez knowingly possessed methamphetamine with intent to distribute it. Furthermore, a jury could conclude they were part of a drug conspiracy that also involved defendant Ray Alcorta. Circumstantial evidence— recorded phone calls and cell phone pictures taken on an airplane—suggests that Adrienne and Angela had served as drug couriers before their June 21 arrest. A jury could also infer from the

phone calls that Mr. Alcorta participated in or aided the drug transaction. Because the government presented enough evidence for a jury to conclude that Adrienne and Angela were guilty of conspiracy and possession of methamphetamine with intent to distribute it, the Court denies their motions for judgment of acquittal.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Raymond Alcorta's Motion for Judgment of Acquittal (Doc. 203) is denied.

**IT IS FURTHER ORDERED BY THE COURT THAT** defendant Adrienne Lopez' and defendant Angela Marie Lopez' oral motions for acquittal are denied.

**IT IS SO ORDERED.**

**Dated this 28th day of October, 2014, at Topeka, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**