# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

     Plaintiff,

v.

RAYMOND ALCORTA (03),

     Defendant.

Case No. 13-40065-03-DDC

## MEMORANDUM AND ORDER

This matter comes before the court on prisoner Raymond Alcorta's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct a Sentence (Doc. 390).  The government has responded to his motion (Doc. 400), and Mr. Alcorta has filed a Reply (Doc. 405).

## I.    Procedural Background

On November 13, 2013, the government charged Mr. Alcorta with conspiracy to distribute more than 500 grams of methamphetamine, violating 21 U.S.C. §§ 846, 841(a)(1), 840(b)(1)(A), and 18 U.S.C § 2.  Doc. 42 at 1–2.  After a seven-day trial, a jury convicted Mr. Alcorta of the conspiracy charge.  Doc. 212 at 1–2.  This court sentenced him to 240 months' imprisonment and five years of supervised release, which was within the advisory Guidelines range.  Doc. 269.  Mr. Alcorta appealed his conviction to the Tenth Circuit, challenging the sufficiency of the evidence and the admission of his coconspirators' recorded jailhouse conversations.  Docs. 276 & 279; *United States v. Alcorta*, 853 F.3d 1123 (10th Cir. 2017).  The Tenth Circuit affirmed Mr. Alcorta's conviction.  Doc. 344.  Mr. Alcorta filed for a writ of certiorari, which the United States Supreme Court denied on March 20, 2018.  Doc. 386.  On

March 19, 2019, Mr. Alcorta filed this § 2255 motion, asking the court to vacate his sentence because of ineffective assistance of trial and appellate counsel.  Doc. 390.

## II.    Factual Background

### A.  Evidence at Trial

On April 27, 2013, police arrested drug couriers Javier Vega and Karmin Salazar near Russell, Kansas.  *Alcorta*, 853 F.3d at 1129.  Vega gave police permission to search his car, and officers discovered four pounds of methamphetamine hidden in a fake automotive battery.  *Id.* Police also seized five mobile phones and various documents from the car.  *Id.*  Two months later, police arrested Adrienne and Angela Lopez near Liberal, Kansas, after finding four pounds of methamphetamine in their car after a traffic stop.  *Id.*  Police also seized mobile phones and various documents from their car.  *Id.*

After listening to recorded phone calls from prison, officers learned the two deliveries were connected.  *Id.*  The recordings, text messages on the seized mobile phones, and seized documents with Mr. Alcorta's name on them connected Mr. Alcorta to the conspiracy.  *Id.* at 1129–31.  The Tenth Circuit reviewed the sufficiency of the evidence against Mr. Alcorta, holding that "a reasonable juror could be convinced beyond a reasonable doubt that [Mr. Alcorta] was an integral part, probably the leader, of a conspiracy to distribute methamphetamine."  *Id.* at 1136–37.

### B.  Jury Instructions and Verdict Form

This court instructed the jury that, to find Mr. Alcorta guilty on Count 1, the government must prove four elements beyond a reasonable doubt:

*First*, two or more persons agreed to violate the federal drug laws;

*Second*, the defendants knew the essential objective of the conspiracy;

*Third*, the defendants knowingly and voluntarily involved themselves in the conspiracy; and

*Fourth*, there was interdependence among the members of the conspiracy.

Doc. 209 at 19.  The verdict form instructed the jury to answer a special interrogatory on the drug quantity issue if it found Mr. Alcorta guilty on Count 1:

> **Question 2**:  We find that the defendant Raymond Alcorta's conduct as a member of the narcotics conspiracy charged, including the reasonably foreseeable conduct of other members of the conspiracy, involved:
>
> _____ More than 500 grams of methamphetamine
>
> _____ Less than 500 grams of methamphetamine.

Doc. 212 at 2.  The jury found Mr. Alcorta guilty on Count 1 and, in response to Question 2, checked the first line indicating "More than 500 grams of methamphetamine."  *Id.*

### C.  Sentencing

Before sentencing, the United States Probation Office prepared a Presentence Investigation Report ("PSR").  Doc. 255.  Based on the amount of methamphetamine police found in the April 27, 2013, and June 21, 2013 car stops of Mr. Alcorta's coconspirators, the PSR held him responsible for 3,626.53 grams (8 pounds) of methamphetamine.  *Id.* at 12 (¶ 57). This quantity resulted in a base offense level of 36, under § 2D1.1(c)(2).  *Id.* at 13 (¶ 62).  The PSR added a four-level enhancement under § 3B1.1(a) to reflect Mr. Alcorta's role as an organizer/leader of the criminal activity (*id.* ¶ 65), resulting in a total offense level of 40 (*id.* ¶ 70).  Mr. Alcorta had a criminal history category of I, which resulted in a Guidelines sentencing range of 292 to 365 months' imprisonment.  *Id.* at 19 (¶ 111).  Mr. Alcorta had a statutorily-mandated minimum sentence of ten years' imprisonment on Count 1 based on the jury's finding that the offense involved 500 grams or more of methamphetamine.  *Id.* (¶ 110).

Mr. Alcorta objected to the PSR's determination that he was an organizer/leader under § 3B1.1(a). Doc. 253 at 5–6 (¶ 14). And, he asked the court to vary downward from the Guidelines sentencing range and impose a sentence of 120 months' imprisonment. *Id.* at 7 (¶ 17). At the sentencing hearing, the court found that Mr. Alcorta's involvement met the standard for a manager/supervisor of the criminal activity at issue under § 3B1.1(c), but not a leader/organizer under § 3B1.1(a). Doc. 306 at 46. The court thus applied a two-level increase to Mr. Alcorta's base offense level, not the four-level increase applied by the PSR. *Id.* This ruling produced a total offense level of 38 and a criminal history category of I. *Id.* at 46–47. Mr. Alcorta's advisory Guidelines sentencing range was 235 to 293 months' imprisonment. *Id.* at 47. The court imposed a sentence of 240 months' imprisonment. *Id.* at 51.

### III.    Legal Standard

A prisoner in federal custody may move to vacate his sentence under 28 U.S.C. § 2255(a) if such "sentence was imposed in violation of the Constitution or laws of the United States." 28 U.S.C. § 2255(a). The Sixth Amendment provides a person charged with a crime the right to assistance of counsel. U.S. Const. amend. VI. While the Sixth Amendment does not explicitly require effective assistance, the Supreme Court has explained that "[i]t relies instead on the legal profession's maintenance of standards sufficient to justify the law's presumption that counsel will fulfill the role in the adversary process that the Amendment envisions." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). So, a habeas claim will lie where the petitioner shows by a preponderance of the evidence that his counsel provided ineffective assistance. *See United States v. Walters*, 492 F. App'x 900, 903 (10th Cir. 2012).

An ineffective-assistance claim requires petitioner to "show both that his counsel's performance 'fell below an objective standard of reasonableness' and that 'the deficient

performance prejudiced the defense.'" *Byrd v. Workman*, 645 F.3d 1159, 1167 (10th Cir. 2011) (quoting *Strickland*, 466 U.S. at 687–88). The court may address the two prongs in any order because, if the petition fails to satisfy either prong, it is fatal to his claim. *Id.* (citing *Strickland*, 466 U.S. at 697) (further citation omitted).

The first prong of the *Strickland* standard requires the petitioner to demonstrate that counsel's conduct fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. The court applies a "strong presumption that 'counsel's conduct falls within the wide range of reasonable professional assistance.'" *Walters*, 492 F. App'x at 903 (quoting *Strickland*, 466 U.S. at 689). "Strategic or tactical decisions on the part of counsel are presumed correct unless they were 'completely unreasonable, not merely wrong so that [they] bear no relationship to a possible defense strategy.'" *United States v. McDonald*, No. 11-10158-EFM, 2013 WL 3867802, at *3 (D. Kan. July 25, 2013) (quoting *Fox v. Ward*, 200 F.3d 1286, 1296 (10th Cir. 2000) (further quotations and citations omitted)).

Strickland's second requirement, commonly called the prejudice prong, requires the petitioner to show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

## IV.    Discussion

Mr. Alcorta asserts that both his trial counsel (Paul Cramm) and appellate counsel (Jonathan Laurans) provided ineffective assistance of counsel. Mr. Alcorta divides his ineffective assistance claim into six parts:

1. Trial counsel deprived Mr. Alcorta of his Sixth Amendment right to counsel of choice by withholding material information at the time counsel undertook representation (Doc. 390 at 4);

2. Trial counsel deprived him of the ability to exercise his right to counsel of choice by withholding material information until mid-trial (*id.* at 5);

3. Trial counsel deprived him of due process of law by unreasonably interfering with defendant's exercise of his right to counsel of choice (*id.* at 7);

4. Trial counsel failed to object to a jury instruction which did not require a finding of drug quantity increasing the minimum penalty range beyond a reasonable doubt (*id.* at 8);

5. Appellate counsel was ineffective because he failed to appeal an erroneous jury instruction (*id.* at 13); and

6. Trial counsel failed to object to the prosecutor's requests for the court to impose a longer prison sentence based on Mr. Alcorta's failure to cooperate (*id.* at 14).

For reasons explained below, the court denies Mr. Alcorta's § 2255 motion.

### A. Did trial counsel deprive defendant of his Sixth Amendment right to counsel of choice by failing to disclose that the prosecutor had previously investigated trial counsel?

The court considers Grounds 1, 2, and 3 together because, fundamentally, they rely on the same allegations. Mr. Alcorta summarizes his allegations for these claims this way:

> Attorney Paul Cramm did not disclose to me at any time before trial that Cramm was previously investigated or otherwise looked [into] by the same prosecutor who was handling my case. During my trial, Cramm's wife/paralegal told me during a short break that Cramm and the prosecutor had this personal history. Cramm's wife/paralegal told me Cramm was previously investigated by the same prosecutor and mentioned something about a grand jury but said no formal charges were ever brought forward. This was the first time I learned about any personal issue between my attorney and the prosecutor. Cramm failed to tell me this information when I was making important decisions about my case including which attorney I wanted to represent me. Cramm's failure to tell me about this information prevented me from knowing the facts that I needed to exercise my right to fire my attorney of choice before trial. The information Cramm withheld from me would have led me to obtain a different attorney.

Doc. 390 at 7.  Mr. Alcorta asserts that if he had known the prosecutor previously had investigated Mr. Cramm, he would not have hired him.[1]  Mr. Alcorta would have wanted to "avoid even a very small chance that the prosecutor might be more harsh towards [him] in even the smallest way."  Doc. 394-1 at 5 (¶ 17).

### 1.      Standard

The Sixth Amendment to the United States Constitution grants a criminal defendant the right to counsel of his choice.  *United States v. Nichols*, 841 F.2d 1485, 1512 n.7 (10th Cir. 1988).  "[E]rroneous deprivation of the right to counsel of choice, with consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as structural error." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 140–41 (2006) (citation omitted) (quotations omitted).  Structural error consists of an error so "intrinsically harmful" that it requires automatic reversal without regard for the error's effect on the case's outcome.  *Neder v. United States*, 527 U.S. 1, 6 (1999).

The Supreme Court has applied the *Strickland* standard to a claim of structural error raised in an ineffective assistance of counsel claim.  *See Weaver v. Massachusetts*, 137 S. Ct. 1899, 1910 (2017) (evaluating petitioner's claim that his right to public trial was violated—a structural error—under the *Strickland* standard because it was raised in an ineffective assistance of counsel claim).  But, *Weaver* cautioned, "[n]either the reasoning nor the holding here calls into question the Court's precedents determining that certain errors are deemed structural and require reversal because they cause fundamental unfairness . . . ."  *Id.* at 1911.  The court thus considers Mr. Alcorta's claim that he was deprived of his Sixth Amendment right to counsel of

---

[1]      The court has no information suggesting that an investigation of Mr. Cramm actually occurred—or, for that matter, did not occur.  Instead, this Order merely reports what Mr. Alcorta's motion has asserted.

his choice under the structural error standard.  Under this standard, if Mr. Alcorta shows he was deprived of his Sixth Amendment right to counsel of choice, he need not show the prejudice required by *Strickland*'s second prong.[2]

## 2.  Discussion

Mr. Alcorta argues that Mr. Cramm's "deception" and "material omissions" deprived him of the right to counsel of his choice.  Doc. 394 at 10–11.  Mr. Alcorta asserts, had he known about "the pre-existing relationship between Cramm and Alcorta's lead prosecutor, he would never have hired Cramm."  *Id.* at 12.  Specifically, Mr. Alcorta claims that Mr. Cramm never informed him that the prosecutor on his case previously had investigated Mr. Cramm.  *Id.*  Mr. Alcorta describes how he learned about this investigation:

> At one point during Alcorta's trial, Cramm and the lead prosecutor approached the judge while the jury was excused to discuss an issue.  Cramm and the lead prosecutor both seemed to be angry with one another at the time.  This seemed different than the previous interactions Alcorta saw during the trial.  While Cramm and the lead prosecutor were arguing Alcorta stayed seated at the counsel's table near Cramm's paralegal who was also Cramm's wife.  It was at this point that Cramm's paralegal told Alcorta that Cramm and the lead prosecutor could not stand each other.  According to Cramm's paralegal, the personal issues between Cramm and the lead prosecutor were not a new development.  Cramm's wife told Alcorta that the lead prosecutor had previously tried to "investigate" or "go after" Cramm but that he was unsuccessful.

Doc. 394 at 3–4.  Also, Mr. Alcorta asserts that by the time he learned of the issue—mid-trial— he thought it was too late to fire Mr. Cramm.  *Id.* at 4.  So, he decided not to raise his concerns with Mr. Cramm then because he wanted Mr. Cramm "to put in his best effort for the rest of the case."  *Id.*

---

[2]     The government's Response applies the *Strickland* standard to Mr. Alcorta's claim that he was denied his Sixth Amendment right to counsel of his choice.  Doc. 400 at 15.  The government argues that, consistent with *Weaver*, a structural error raised in an effective assistance of counsel claim should be evaluated under both prongs of the *Strickland* standard.  But the court does not read *Weaver* so broadly and, instead, applies the structural error standard in its analysis here.

Mr. Alcorta's argument is unpersuasive. Under the Sixth Amendment, a criminal defendant has a right to the assistance of counsel. U.S. Const. amend. VI. And, a defendant has a right to retain counsel of his choice. *Powell v. Alabama*, 287 U.S. 45, 53 (1932); *see also United States v. Gonzalez-Lopez*, 548 U.S. 140, 147–48 (2006) (holding that deprivation of right to chosen counsel is "complete" when a defendant is "erroneously prevented from being represented by the lawyer he wants, regardless of the quality of representation he received"). A right to counsel of choice violation occurs when a court impermissibly denies a defendant his chosen counsel. *See, e.g.*, *Luis v. United States*, 136 S. Ct. 1083, 1088 (2016) (holding that the "pretrial restraint of legitimate, untainted assets needed to retain counsel of choice violates the Sixth Amendment").

But, under some circumstances, a court may deny a defendant his chosen counsel. *See, e.g.*, *Wheat v. United States*, 486 U.S. 153, 162 (1988) (court may deny defendant's choice of attorney where it justifiably finds conflict of interest); *Henness v. Bagley*, 644 F.3d 308, 321–22 (6th Cir. 2011) (right to chosen counsel not violated where court denied counsel's motion to withdraw after guilt phase of the trial, because changing counsel at that point would result in delay and expense; *United States v. Graham*, 643 F.3d 885, 894–95 (11th Cir. 2011) (right to chosen counsel not violated by decision denying motion for continuance of trial to retain counsel of choice because defendant had time to retain counsel, and if he "failed to obtain what he considered to be ideal counsel, it is nobody's fault but his own").

In *Wheat* and cases like it, the defendant claimed that the court denied the defendant his chosen counsel. But here, Mr. Alcorta makes a different argument. He does not argue that the court denied him his right to counsel of choice. Rather, Mr. Alcorta argues that he was deprived of his right to chosen counsel because he would have chosen differently had he known of alleged

hostility between Mr. Cramm and the prosecutor.  The court has identified no case where a defendant has argued—successfully or otherwise—that his chosen counsel's alleged omissions support a Sixth Amendment choice of counsel violation.

Mr. Alcorta also asserts that Mr. Cramm deprived him of his right to fire his retained choice of counsel by withholding the information about the investigation until mid-trial.  Doc. 394 at 14 (citing *United States v. Jimenez-Antunez*, 820 F.3d 1267, 1271 (11th Cir. 2016)).  Mr. Alcorta explains, "He did not fire Cramm during the trial because [he] was afraid [he] would be left without an attorney or that Cramm would stay in the case but not fight as hard for [him]."  Doc. 390 at 5.  But Mr. Alcorta's claim that he feared a complaint about Mr. Cramm might leave him without representation is unpersuasive.  The court informed Mr. Alcorta of his constitutional rights—including the right to counsel—at his first appearance in the case.[3]  Doc. 108.  So, Mr. Alcorta knew he had a right to an attorney.  In sum, Mr. Alcorta can blame no one other than himself for the decision that he—and he alone—made.  Mr. Alcorta decided not to articulate his concern.  Mr. Alcorta chose to continue trial with his retained counsel.

Mr. Alcorta retained an attorney he believed was qualified to represent him at trial.[4]  Consistent with his Sixth Amendment right to retain counsel of his choice, he chose Mr. Cramm.  The court did not select Mr. Cramm.  And, the court did not interfere with this choice.  *See Gonzalez-Lopez*, 548 U.S. at 146 (the right to counsel of choice commands "not that a trial be fair," but that "the accused be defended by counsel he believes to be best").  And now, Mr.

---

[3]     Under Fed. R. Crim. P. 5(d)(1)(B), the judge must inform the defendant of his "right to retain counsel or to request that counsel be appointed if the defendant cannot obtain counsel."

[4]     Mr. Alcorta states that Mr. Cramm, in initial consultations, "discussed his background and experience handling similar cases in federal court" and that Mr. Alcorta "asked [Mr.] Cramm a number of detailed questions about how he would handle [Mr.] Alcorta's case if he was hired and what [Mr.] Cramm's approach would be to the defense."  Doc. 394 at 3.  Mr. Alcorta decided to hire Mr. Cramm "based on the information Alcorta had available."  *Id.*

Alcorta complains that the court failed to free him from his choice of counsel because of a request Mr. Alcorta never made. No caselaw supports the proposition that Mr. Alcorta would have the court adopt. And the ramifications of such a ruling could be significant. The court declines to find that Mr. Alcorta was deprived of his Sixth Amendment right to counsel of choice.

Finally, Mr. Alcorta argues that Mr. Cramm's "failure to a) disclose the personal potential conflict, b) advise his client of potential risks, and c) advise his client of the right to seek independent counsel before giving informed written consent all violated Alcorta's right to Due Process of law." Doc. 394 at 15 (citing *United States v. Alvarez*, 580 F.2d 1251, 1256–57 (5th Cir. 1978)). But Mr. Alcorta also states that he is, "not asserting that attorney Cramm was operating under an actual conflict of interest in his representation." Doc. 394 at 12. Mr. Alcorta's vague and conclusory assertions about his retained counsel's "personal potential conflict" cannot support a due process violation. The court cannot conclude that Mr. Cramm interfered with Mr. Alcorta's due process right because he failed to disclose a personal conflict with the prosecutor, even if such a conflict actually existed.

### B.   Were trial and appellate counsel ineffective for failing to object to a jury instruction which did not require a finding about the minimum drug quantity beyond a reasonable doubt?

The jury convicted Mr. Alcorta of one count of conspiring to distribute controlled substances in violation of 21 U.S.C. §§ 846 and 841(a). The jury instructions listed four elements the government must prove beyond a reasonable doubt.[5] Doc. 209 at 19. The verdict

---

[5]      The four elements specified in the pertinent instruction were as follows: "*First*, two or more persons agreed to violate the federal drug laws; *Second*, the defendants knew the essential objective of the conspiracy; *Third*, the defendants knowingly and voluntarily involved themselves in the conspiracy; and *Fourth*, there was interdependence among the members of the conspiracy." Doc. 209 at 19.

form also instructed the jury to answer a special interrogatory on the charged drug quantity—if

the jury found Mr. Alcorta guilty on Count 1:

> **Question 2**:  We find that defendant Raymond Alcorta's conduct as a member of
> the narcotics conspiracy charged, including the reasonably foreseeable conduct of
> other members of the conspiracy, involved:
>
> _____ More than 500 grams of methamphetamine
>
> _____ Less than 500 grams of methamphetamine.

Doc. 212 at 2.  The jury found Mr. Alcorta guilty on Count 1, and in its response to Question 2,

checked the "More than 500 grams of methamphetamine" line.  *Id.* at 1–2.

### 1.  Deficient Performance

Mr. Alcorta argues that Mr. Cramm "performed deficiently when he failed to object to

the final jury instructions and jury verdict form which together did not submit the drug quantity

finding to the jury under the beyond a reasonable doubt standard."  Doc. 394 at 20.  The drug

quantity attributable to Mr. Alcorta—more than 500 grams of methamphetamine—triggered a

ten-year statutory minimum sentence under § 841(b)(1)(A).  It was thus an element of the

offense that the jury should have been required to find beyond a reasonable doubt.  *United States

v. Alleyne*, 570 U.S. 99, 112 (2013) ("A fact triggering a mandatory minimum alters the

prescribed range of sentences to which a defendant is exposed.").  "When a finding of fact alters

the legally prescribed punishment so as to aggravate it, the fact necessarily forms a constituent

part of a new offense and must be submitted to the jury."  *Id.* at 114–15.  And thus, the element

must "be found by the jury beyond a reasonable doubt."  *Id.* at 117.

The government concedes that the verdict form's Question 2 should have asked the jury

to find the drug quantity under the "beyond a reasonable doubt" standard.  Doc. 400 at 24.  And,

the government concedes that Mr. Cramm's failure to object on this issue was deficient

performance.  *Id.*  The government's concession leaves just one question:  whether Mr. Cramm's deficient performance prejudiced Mr. Alcorta.

### 2.  Prejudice

Mr. Alcorta argues that Mr. Cramm's deficient performance was prejudicial because it "deprived the jury of the opportunity to render a conviction for a simple drug conspiracy," with no statutory minimum term, a maximum sentence of 20 years, and a lower Guidelines range.[6] Doc. 394 at 22.  He argues that with a "properly instructed jury there would have been a reasonable probability that [his] absolute maximum sentencing exposure would have been 20 years and his guideline range lowered."  Doc. 394 at 22.  To establish prejudice, Mr. Alcorta must show that but for Mr. Cramm's failure to object to the omission of "beyond a reasonable doubt" language on the drug quantity special interrogatory, a reasonable probability existed that the jury would have found him responsible for less than 500 grams of methamphetamine.  *See United States v. Edwards*, 775 F. App'x 408, 411 (10th Cir. 2019) (explaining there must exist a "reasonable probability the jury would have reached a different verdict.")

Mr. Alcorta fails to establish a reasonable probability that the jury—properly instructed on the "beyond a reasonable doubt" standard as part of the special interrogatory about drug quantity—would have reached a different result.  The jury convicted Mr. Alcorta of the conspiracy charge in Count 1.  And, on direct appeal, the Tenth Circuit concluded that the government had established sufficient evidence for a reasonable jury to find the elements of a conspiracy beyond a reasonable doubt.  Thus, the question is whether there is a reasonable

---

[6]     If Mr. Alcorta had been convicted of a simple drug conspiracy, he would have been subject to the penalty section in 21 U.S.C. § 841(b)(1)(C), which sets a statutory maximum sentence of 20 years' imprisonment.

probability the jury would *not* have found Mr. Alcorta responsible for more than 500 grams of methamphetamine had the special interrogatory included the reasonable doubt standard.

In reviewing the sufficiency of the evidence on direct appeal, the Tenth Circuit found sufficient evidence connecting Mr. Alcorta to three drug delivery trips from California to Kansas. *Alcorta*, 853 F.3d at 1136. The Circuit found the following evidence tied Mr. Alcorta to what the Circuit called the "first trip."

> [T]he documents bearing his name found in the car; a text from Salazar to [Mr. Alcorta] one month before she was arrested indicating that she would soon be ready to work for him; [Mr. Alcorta's] text to Vega a few days before Vega was arrested stating, "I need to know if you're going"; Vega's lament to Adrienne that [Mr. Alcorta] sent Salazar on the trip instead of Adrienne; Vega's complaints that [Mr. Alcorta] sent him on trips with a foolish companion who threw napkins out the window; Vega's statement to [Mr. Alcorta] that he erased all the data on his two phones before he was arrested and his advice to Defendant to get rid of his phone; Vega's statement to [Mr. Alcorta] that he should take Vega's contacts, which were the people that he was "dealing with" and "making money from"; Vega's expectation that [Mr. Alcorta] would provide money to him and Salazar while they were in jail, and [Mr. Alcorta's] fulfillment of that expectation; and [Mr. Alcorta's] vagueness and circumspection when speaking with Vega on the jailhouse phone.

*Id.* The arrests of Mr. Alcorta's coconspirators on the first trip yielded about four pounds (1,814.37 grams) of methamphetamine. *Id.* at 1129. The Tenth Circuit also found sufficient evidence connecting Mr. Alcorta to what it termed "the successful second delivery":

> [Mr. Alcorta's] conversation with Vega stating that Adrienne was responsible to do "it" just as she was driving to Kansas City to deliver drugs; his turnaround flight to Kansas City at the same time that Adrienne and Angela were there; his statement to Vega that Adrienne came back safely from the trip; and Adrienne's report back to Vega that [Mr. Alcorta] was "home sweet home" and that "everything is cool."

*Id.* at 1136. Finally, the Tenth Circuit found evidence sufficient to connect Mr. Alcorta to the failed third delivery—the trip producing the traffic stop near Liberal, Kansas:

> Evidence tying [Mr. Alcorta] to the failed third delivery included Adrienne's statement to Vega on the day before her arrest that she missed a call from [Mr. Alcorta]; Vega's questions about whether [Mr. Alcorta] provided gas money for Adrienne's drive; Vega's advice to Adrienne that she solicit [Mr. Alcorta] for help

> obtaining a car for the drive to Kansas City; [Mr. Alcorta's] 25 phone calls to Adrienne on the day that she was arrested; his conversation with Vega about there being no reason for Adrienne to "make mistakes" on her drive; Adrienne's using a fake name for [Mr. Alcorta] in her phone contact list; and [Mr. Alcorta's] driving to Kansas to bail Adrienne out of jail after her arrest.

*Id.* This arrest, on June 21, 2013, revealed another four pounds (1,814.37 grams) of methamphetamine. *Id.* at 1129.

The Tenth Circuit concluded that "[f]rom this evidence, the jury could reasonably infer that [Mr. Alcorta] conspired to traffic drugs with Vega, Salazar, Adrienne, and Angela. *Id.* at 1136. And, "[b]ased on the circumstantial evidence in this case, a reasonable juror could be convinced beyond a reasonable doubt that [Mr. Alcorta] was an integral part, probably the leader, of a conspiracy to distribute methamphetamine." *Id.* at 1136–37. The evidence at trial thus established that Mr. Alcorta's coconspirators possessed a total slightly more than eight pounds (3,628.74 grams) of methamphetamine when police arrested them—and this total attributes no drug quantity to the successful second delivery by Mr. Alcorta's coconspirators. Mr. Alcorta has failed to establish that including the "beyond a reasonable doubt" language in the jury instruction and verdict form could have created a reasonable possibility that the jury would have found him responsible for less than 500 grams of methamphetamine. *See Harrington v. Richter*, 562 U.S. 86, 111 (2011) ("The likelihood of a different result must be substantial, not just conceivable."). The court finds that Mr. Cramm's failure to object on this issue did not prejudice Mr. Alcorta. The court thus denies relief on this ground.

### C. Was appellate counsel ineffective for failing to appeal an erroneous jury instruction?

The right to effective assistance of counsel extends to direct appeal, and the *Strickland* standard also applies in this context. *Pavatt v. Carpenter*, 928 F.3d 906, 931 (10th Cir. 2019)

(citations omitted).  For reasons explained below, this argument about appellate counsel's performance will not support the relief Mr. Alcorta seeks in his § 2255 motion.

### 1.  Deficient Performance

To show deficient performance by appellate counsel, a defendant must show "that appellate counsel unreasonably failed to discover a nonfrivolous issue and to file a merits brief raising it."  *Milton v. Miller*, 744 F.3d 660, 669 (10th Cir. 2014) (quoting *Smith v. Robbins*, 528 U.S. 259, 285 (2000)) (alterations omitted).  Mr. Alcorta argues that his appellate counsel was ineffective for failing to raise the *Alleyne* jury instruction issue on direct appeal, *i.e.*, challenging the omission of the reasonable doubt requirement from the drug quantity interrogatory.[7]  Doc. 394 at 22.  The government concedes that appellate counsel "performed ineffectively in failing to raise this issue because it was a nonfrivolous issue and appellate counsel failed to file a merits brief raising it."  Doc. 400 at 32.  The court thus considers whether counsel's deficient performance prejudiced Mr. Alcorta.

### 2.  Prejudice

To show prejudice, "the defendant 'must show a reasonable probability that, but for his counsel's unreasonable failure to' raise a nonfrivolous issue, 'he would have prevailed on his appeal.'"  *Id.* (quoting *Smith*, 528 U.S. at 285).  In other words, Mr. Alcorta must show a reasonable probability that the Tenth Circuit would have reversed his conviction had appellate counsel raised the *Alleyne* jury instruction error.

Invoking *United States v. Ellis*, 868 F.3d 1155 (10th Cir. 2017), Mr. Alcorta argues that trial counsel need not have objected to preserve his *Alleyne* objection for appeal.  Doc. 394 at 22.

---

[7]       As discussed *supra*, Part IV.B.1., Mr. Alcorta and the government agree that *United States v. Alleyne*, 570 U.S. 99, 112 (2013), required the jury to find drug quantity beyond a reasonable doubt. Since the "beyond a reasonable doubt" language was omitted from the instructions, the parties agree that error was made.

Thus, he contends, the Tenth Circuit would have applied a "constitutional harmless-error standard, one requiring the government to prove harmlessness beyond a reasonable doubt."  Doc. 394 at 22–23 (quoting *Ellis*, 868 F.3d at 1172).  Under this standard, Mr. Alcorta argues, there is a reasonable probability that the Tenth Circuit would have reversed his conviction.  Doc. 394 at 22.  The government disagrees.  It argues that since Mr. Alcorta failed to raise the issue in the district court, a plain-error standard would have applied.  Doc. 400 at 32 (citing Fed. R. Crim. P. 52(b) and *United States v. Wright*, 848 F.3d 1274, 1278–79 (10th Cir. 2017)).  The government argues Mr. Alcorta could not have prevailed on appeal under this standard.  Doc. 400 at 32.  Thus, the government contends, Mr. Alcorta was not prejudiced by his appellate counsel's deficient performance.  Doc. 400 at 32.

In *United States v. Johnson*, The Tenth Circuit discussed the proper standard of review for an *Alleyne* error raised in a direct appeal:

> It is worth noting, however, that after the briefing was completed in this appeal we rejected the notion that a defendant must object to jury instructions to preserve a claim of *Alleyne* error.  *Ellis* made clear that a defendant need not "object during trial to the jury instructions or the general verdict form to preserve an *Alleyne* objection."  Instead, the burden is on the government to make sure the jury is properly instructed . . . .  Nevertheless, a defendant must object at some point before she is sentenced to preserve *Alleyne* error.

*United States v. Johnson*, 878 F.3d 925, 933 n.2 (10th Cir. 2017) (citations and quotations omitted) (alterations omitted).  Under *Johnson*, Mr. Alcorta's trial counsel must have raised the *Alleyne* error before sentencing to preserve the issue for appeal.  Here, Mr. Alcorta's trial counsel didn't preserve the error, and so, the plain-error standard applies.  *See United States v. Wright*, 848 F.3d 1274, 1278 (10th Cir. 2017) (reviewing defendant's unpreserved claim that jury instruction failed to include a necessary element of the offense under a plain-error standard).

Under the plain-error standard, Mr. Alcorta "must establish (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (internal quotation marks omitted) (citations omitted). The government concedes that Mr. Alcorta could have established plain error (*i.e.*, the first two parts of the plain-error test) under *Alleyne*. And, Mr. Alcorta can satisfy the fourth part as well, because, when a defendant has been denied his "Sixth Amendment right to a jury determination of an important element of the crime, the integrity of the judicial proceeding is jeopardized." *Johnson*, 878 F.3d at 929 (quoting *United States v. Fast Horse*, 747 F.3d 1040, 1044 (8th Cir. 2014)).

But, the government responds, Mr. Alcorta cannot establish the third requirement of the test—*i.e.*, that the error affected his substantial rights. Doc. 400. Instead, the government asserts, the "overwhelming evidence showed that more than 500 grams of methamphetamine was foreseeable" to Mr. Alcorta. Doc. 400 at 33. Mr. Alcorta asserts that even under plain-error review, he is entitled to relief under *Johnson*, which reversed the defendant's conviction on the same *Alleyne* issue.

In *Johnson*, the Tenth Circuit found that the district court's *Alleyne* error affected the defendant's substantial rights. *Johnson*, 878 F.3d at 929. The court reasoned that just because the jury could have inferred that the defendant's coconspirators drug dealings were reasonably foreseeable to defendant, "does not mean that it would have been unreasonable for the jury to reach a contrary conclusion." *Id.* And, the "issue of drug quantity was heavily contested at trial and far from overwhelming."[8] *Id.* at 930.

---

[8]     Specifically, in *Johnson*, during cross-examination, defendant elicited the following testimony: (1) the confidential informant never saw defendant selling drugs, cooking drugs, or handling large sums of money; (2) defendant did not drive her coconspirators to any of the drug transactions with the confidential informant, which "made up the bulk" of the government's quantity argument; (3) no drugs,

In Mr. Alcorta's case, the Tenth Circuit already has reviewed the sufficiency of the evidence against Mr. Alcorta on direct appeal.[9]  *Alcorta*, 853 F.3d 1123 (10th Cir. 2017).  The jury found beyond a reasonable doubt that Mr. Alcorta was a member of the conspiracy to distribute methamphetamine.  The Tenth Circuit found sufficient evidence for this aspect of the verdict, concluding that, "[b]ased on the circumstantial evidence in this case, a reasonable juror could be convinced beyond a reasonable doubt that [Mr. Alcorta] was an integral part, probably the leader, of a conspiracy to distribute methamphetamine."  *Id.* at 1136–37.  And, the arrest of Mr. Alcorta's coconspirators yielded some eight pounds (3,628.74 grams) of methamphetamine. The court thus concludes that the evidence against Mr. Alcorta on the drug quantity issue was markedly different than the evidence in *Johnson*.  It was, in the Circuit's words in *Johnson*, "overwhelming."  878 F.3d at 930.  The court concludes that the *Alleyne* error did not affect Mr. Alcorta's substantial rights at trial, so the court denies Mr. Alcorta's ineffective assistance of appellate counsel claim.

### D.  Was trial counsel ineffective for failing to object to the government's comments at sentencing?

Mr. Alcorta asked the court to vary downward from the advisory Guidelines range and impose a sentence of 120 months' imprisonment.  Doc. 253 at 7 (¶ 17).  The government opposed a downward variance at the sentencing hearing, arguing:

> In addition to that, Mr. Alcorta wasn't manufacturing these drugs out of thin air. They came from somewhere.  And this sort of dovetails into my argument about the variance and the fact that one of the difficulties I have with the variance argument, at least here, is that it's really just a plea for leniency.

---

drug-dealing paraphernalia, or large sums of money were found in defendant's home; and (4) the government's quantity assertion was undermined by evidence that her coconspirators sold two different types of cocaine, the quantity amounts discussed in phone calls often were inflated, and coded language used in wiretapped phone calls was subject to "wildly different interpretations."  *Johnson*, 878 F.3d at 929–30.

[9]      *See supra*, Part IV.B.2.

> And in fact, the entire time he's been charged in this case Mr. Alcorta has held the keys to his cell, to some extent.  He has made the conscious decision that it's not worth a reduction in sentence in exchange for cooperation.  But that's a conscious decision.  He has always had that ability.  And in fact, he has that ability today.
>
> When he argues, basically in his plea for leniency, what he doesn't mention is he has the ability to work for a Rule 35 motion from the government that would reduce his sentence.  I very very seldom close the door on that sort of an offer.  And I can tell you that the door is not closed here.  So Mr. Alcorta continues to hold the keys to his cell to some extent.
>
> But those drugs were coming from somewhere.  We don't know where right now because Mr. Alcorta hasn't told us where and our investigation hasn't revealed where they were coming from.  We're at a dead end with him.

Doc. 306 at 22–23.  Mr. Alcorta argues that "counsel was ineffective at sentencing for failing to object to prosecutor's requests for the [c]ourt to impose a longer prison sentence based on Alcorta's failure to cooperate."  Doc. 390 at 14.  He argues that the prosecutor "should not have been allowed to seek a longer prison sentence based on any reference to cooperation and [his] attorney should have objected," and "there is a reasonable probability that [he] would have received a shorter prison sentence if [his] attorney had objected."  *Id.*  During the sentencing hearing, Mr. Alcorta questioned the prosecutor's comments that he would consider supporting a downward variance if Mr. Alcorta cooperated:

> I just find it odd that the government would be okay with 10 years if I cooperated.  I don't understand that.  Because this is a just punishment for the crime.  Whether I cooperate or I don't cooperate doesn't change the crime any more.  It doesn't change what happened.  And I understand that.  I'm just—I just don't—I'm not debating anything with you, per se.  It's more on what the government says, well, I'll be okay giving him 10 years if he helps or cooperates.  How does that change the crime?  How does it change the victims?

*Id.* at 55.

Mr. Alcorta's Memorandum doesn't expand on this argument.  The government argues that counsel's performance could not have been deficient because no legal basis existed for an

objection.  Doc. 400 at 35.  Rather, the government opposed a downward variance because Mr.

Alcorta hadn't cooperated.  And, the court noted that, "that part of the comments from the

government did not affect [its] sentencing decision."  Doc. 306 at 56.  Since Mr. Alcorta fails to

establish deficient performance or prejudice, the court rejects this argument in his § 2255 motion.

   **V.       Certificate of Appealability**

   Finally, Rule 11 of the Rules Governing Section 2255 Proceedings requires the court to

"issue or deny a certificate of appealability when it enters a final order adverse" to the petitioner.

A court may grant a certificate of appealability only "if the applicant has made a substantial

showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  A petitioner satisfies

this burden if "reasonable jurists would find the district court's assessment of the constitutional

claims debatable or wrong." *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (citations and internal

quotation marks omitted).  The court concludes a reasonable jurist could find the court's

assessment of Mr. Alcorta's claims debatable or wrong. *See id.*  Though ultimately unpersuaded

by Mr. Alcorta's motion, he has made substantial arguments.  The court thus issues Mr. Alcorta a

certificate of appealability.

   **IT IS THEREFORE ORDERED BY THE COURT THAT** Mr. Alcorta's Motion

under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct a Sentence by a Person in Federal

Custody (Doc. 390) is denied.

   **IT IS FURTHER ORDERED THAT** a certificate of appealability shall issue.

   **IT IS SO ORDERED.**

   **Dated this 12th day of August, 2020, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**

**Daniel D. Crabtree**

**United States District Judge**
